# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| JCC TRANSPORT, LLC and CBP AIR LOGISTICS, LLC, individually and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TEXTRON AVIATION, INC.,<br><br>Defendant. | Case No. <u>2:25-cv-02514-HLT-GEB</u><br><br><br>**JURY TRIAL DEMANDED** |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................................1

II.   THE PARTIES..................................................................................................................4

    A.    Plaintiff JCC Transport, LLC ............................................................................4

    B.    Plaintiff CBP Air Logistics, LLC ......................................................................4

    C.    Defendant Textron Aviation, Inc. .......................................................................5

III.  JURISDICTION AND VENUE ......................................................................................5

    A.    Subject Matter Jurisdiction ................................................................................5

    B.    Personal Jurisdiction ...........................................................................................5

    C.    Venue ...................................................................................................................6

    D.    Applicable law ....................................................................................................7

IV.   FACTUAL ALLEGATIONS ...........................................................................................7

    A.    JCC's CJ4 and Harm Suffered Due to the Defect...............................................7

    B.    CBP's CJ4 and Harm Suffered Due to the Defect.............................................13

    C.    The Cessna Citation CJ4 ....................................................................................13

    D.    The Nature of the Defect.....................................................................................17

    E.    Safety Implications of the Defect .......................................................................19

    F.    Textron Aviation Issued a Technical Service Bulletin .......................................21

    G.    Inspection of Repairs to an Aircraft Confirmed Fundamental Problems with the Service Bulletin Repair ................................................................................23

    H.    Textron Aviation's Fix Is Costly and Time-Consuming ....................................24

    I.    Textron Aviation's Express Warranty Does Not Remedy the Defect ................27

    J.    Textron Aviation's Knowledge of the Corrosion Defect....................................27

    K.    Textron Aviation's Marketing and Concealment ..............................................31

V.    TOLLING OF THE STATUTE OF LIMITATIONS....................................................37

    A.    Fraudulent Concealment Tolling .......................................................................37

    B.    Estoppel...............................................................................................................37

    C.    Discovery Rule....................................................................................................38

VI.   CLASS ALLEGATIONS ...............................................................................................38

    A.    Rule 23(a) is Satisfied........................................................................................39

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.      The Requirements of Rule 23(b)(3) and 23(c)(4) Are Satisfied .......................................42

C.      Rule 23(b)(2) Is Satisfied ...............................................................................................43

VII.    CLAIMS FOR RELIEF ............................................................................................................43

COUNT I BREACH OF EXPRESS WARRANTY .......................................................43

COUNT II BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY .......................47

COUNT III FRAUDULENT CONCEALMENT ............................................................49

COUNT IV UNJUST ENRICHMENT ........................................................................52

COUNT V NEGLIGENT MISREPRESENTATION ....................................................54

COUNT VI STRICT LIABILITY - FAILURE TO WARN ...........................................55

COUNT VII NEGLIGENCE - DESIGN DEFECT.......................................................57

COUNT VIII STRICT LIABILITY DESIGN DEFECT................................................58

VIII.   PRAYER FOR RELIEF ...........................................................................................................60

IX.     DEMAND FOR A JURY TRIAL .............................................................................................61

X.      DESIGNATION OF PLACE OF TRIAL..................................................................................61

## I.    **INTRODUCTION**

1.    The Cessna Citation CJ4[1] ("CJ4" or "Aircraft") is a private aircraft designed, manufactured, sold, and warranted by Textron Aviation, Inc. ("Textron Aviation").

2.    All CJ4s suffer from a severe, dangerous, uniform defect (the "Corrosion Defect" or "Defect") that results in corrosion of the Aircraft's structural components ("Corrosion").

3.    The Corrosion begins in the window frames of the windshield and cockpit windows and spreads into other areas of the Aircraft. It is progressive: once it starts, the Corrosion becomes exponentially worse with time, as existing Corrosion attracts additional moisture to the affected area and the problem ricochets out of control.

4.    The Corrosion is not a routine or expected result of ordinary use of an aircraft. Such corrosion should not ever happen during the 30-year+ expected useful life of an in-service aircraft.

5.    Corrosion on these structural components can weaken the body of the Aircraft and cause cracks in its airframe. This type of damage puts an Aircraft at risk of catastrophic and deadly in-flight failure, because a weaker structure is less able to withstand the immense pressure it is subjected to during in the ordinary course of takeoff, flight, and landing.

6.    While the consequences of this Corrosion are severe, the Corrosion itself is not visible unless the Aircraft is taken apart and inspected. Unless and until an Aircraft is inspected for this issue, the Corrosion will remain hidden underneath the windows and exterior metal of the aircraft body.

---

[1] "CJ4" includes all iterations of the Citation CJ4 model series, which share substantially identical airframes and are manufactured under the same Type Certificate. This includes but is not limited to the Cessna Model 525C, as well as any aircraft marketed under derivative designations that conform to the 525C type design, regardless of minor equipment variations or other optional avionics packages offered under trade names such as "Gen2" or other special editions.

7.      This type of Corrosion is the result of defective design and/or manufacturing. It occurs even when the Aircraft is maintained in accordance with the Aircraft's maintenance manual and all applicable FAA standards (and thus is legal to fly). It is not the result of any action (or inaction) by the owner.

8.      In April 2024, Textron Aviation issued Service Bulletin SB525C-56-01 ("Service Bulletin") recommending that all CJ4 owners have their Aircraft inspected and, if necessary, repaired due to a condition in the window frames that causes "moisture incursion." *See* Ex. A. Nowhere does Textron Aviation admit that this "moisture incursion" is the result of the Corrosion Defect, nor does it warn owners of the safety risk the Corrosion poses. The Service Bulletin is by its own terms not even mandatory—it does not require that the inspection and repairs be performed, nor does it provide a timeline on which the Aircraft must be inspected for "moisture incursion." The Service Bulletin describes a repair and inspection process that costs approximately $50,000 for owners whose Aircraft are no longer covered under the express warranty.

9.      Preliminary expert analysis suggests that the repair dictated in the Service Bulletin does little to address the underlying causes of the Defect and may actually structurally further weaken the aircraft, creating new and distinct catastrophic failure risks. Specifically, the Service Bulletin requires shaving Corrosion off impacted metal, potentially weakening the metal structures to a point that impacts the flightworthiness of the Aircraft.

10.     The Service Bulletin also does not disclose that many (if not all) CJ4s will require a second repair following inspection that is far more expensive, time-consuming, and involved than the repair outlined in the Service Bulletin. This second-level repair, which typically requires replacing large parts of the aircraft body, ranges from several hundred thousand dollars to over

$1 million, and takes six months or more to complete. Textron Aviation requires owners to pay for a significant portion of these repairs out of pocket, even though the damage results from a design and/or manufacturing defect rather than anything under an owner's control, and even though such Corrosion should never happen during the useful life of the aircraft. Textron Aviation has offered owners discounts off the full price of these repairs, but only if they sign a complete release of claims and a non-disclosure agreement.

11.     At all times—including when requiring owners to sign full releases of liability—Textron Aviation concealed and continues to conceal the true nature, scope, and cause of the Corrosion Defect, as well as its potential to cause catastrophic in-flight failure and the enormous cost of effectively repairing damage caused by the Defect. Instead of providing owners of the Aircraft with fulsome disclosures and providing a free, comprehensive inspection and repair to all owners, Textron Aviation has chosen to hide the truth and shift the financial responsibility for returning the Aircraft to a safe, usable condition to the owners.

12.     Textron Aviation was put on notice of the Defect by Plaintiffs and other proposed Class Members prior to the filing of this complaint and given an opportunity to resolve these claims by making fulsome disclosures to all owners and lessees of the Aircraft and agreeing to cover all costs of inspection and repair to return them a safe, usable condition. It declined. Plaintiffs' Counsel sent a formal pre-suit notice letter on behalf of an owner and member of the proposed Class on behalf of it and all other owners and lessees on June 12, 2025, describing the underlying facts and including the preliminary findings of Plaintiff's expert. *See* Ex. B. In response, Textron Aviation has not denied the existence of the Corrosion Defect, nor explained why it should not be liable for covering the full cost of all repairs beyond generalized denials of legal liability, nor offered owners inspections and full repairs free of charge. Plaintiffs' Counsel

followed their initial outreach with a second letter on June 27, 2025, to which Textron Aviation likewise did not respond with substantive information about the Defect or an offer of classwide relief. *See* Ex. C.

13.     Plaintiffs JCC Transport, LLC and CBP Air Logistics, LLC own CJ4 Aircraft suffering from the Corrosion Defect. Plaintiffs bring this case on behalf of themselves and all others similarly situated ("Class Members") for monetary damages to recover the full cost of repairs and/or lost resale value and/or loss of use damages, declaratory relief, and an injunction ordering Textron Aviation to immediately notify all owners and lessees of the Corrosion Defect and the fact that it involves a safety risk, and provide inspections and all necessary repairs free of charge and in a timely manner.

## II.     THE PARTIES

### A.     Plaintiff JCC Transport, LLC

14.     Plaintiff JCC Transport, LLC ("JCC") is an Indiana limited liability company. Registered at 8440 Coral Reef Ct, Indianapolis, IN, 46256.

15.     Plaintiff JCC Transport, LLC is managed and owned by John Huntzinger and Bogumila Kopczynski, who are both citizens of Indiana.

16.     Plaintiff JCC Transport, LLC is the sole owner of a 2018 CJ4 Citation Aircraft designed, manufactured, sold, and warranted by Textron Aviation bearing the serial number 525-0274 and the tail number N38MV. JCC purchased its CJ4 in Wichita, Kansas.

### B.     Plaintiff CBP Air Logistics, LLC

17.     Plaintiff CBP Air Logistics, LLC ("CBP") is a Georgia limited liability company. Its principal place of business is 1928 Executive Park, Statham, GA 30666.

18.     Plaintiff CBP is managed and wholly owned by Ronald Cooper, who is a citizen of Florida.

19.     Plaintiff CBP is the sole owner of a 2012 CJ4 Citation Aircraft designed, manufactured, sold, and warranted by Textron Aviation bearing the serial number 525C-0073 and the tail number N150RC. CBP purchased its CJ4 in Fort Lauderdale, Florida.

**C.     Defendant Textron Aviation, Inc.**

20.     Defendant Textron Aviation, Inc. is a corporation headquartered in Wichita, Kansas and incorporated under the laws of Kansas.

21.     At all times relevant herein, Textron Aviation (itself and through its related entities) engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, leasing, and servicing the Aircraft.

22.     In 1992, Textron Aviation purchased the Cessna Aircraft Company, which it operated as an independent subsidiary until 2014. In 2014, Textron Aviation ceased Cessna Aircraft Company's operations as an independent subsidiary. However, Textron Aviation continues to use the brand name Cessna to market and sell the Aircraft.

## III.     JURISDICTION AND VENUE

**A.     Subject Matter Jurisdiction**

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act because: the amount in controversy exceeds $5,000,000; and Defendant Textron Aviation is a citizen of Kansas and is therefore diverse from at least one Plaintiff.

**B.     Personal Jurisdiction**

24.     This Court has personal jurisdiction over Textron Aviation because it is authorized to do business in this District, conducts substantial business in the District, has its principal place of business in the District, is at home in the District, and many of the actions giving rise to the complaint took place in the District.

25.     Additionally, the 5-year/5,000-flight-hour limited warranty that, upon information and belief, comes standard with each new CJ4 and is issued by Textron Aviation ("Limited Warranty") stipulates that all parties to the Limited Warranty must consent to personal jurisdiction in Kansas. *See* Ex. D.

26.     Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over Textron Aviation permissible under traditional notions of fair play and substantial justice.

**C.     <u>Venue</u>**

27.     Venue is proper in this District under 28 U.S.C. § 1391 because Textron Aviation, as a corporation, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

28.     Additionally, Textron Aviation transacts business within the District, Textron Aviation has its principal place of business in this District, and many of the events establishing the claims occurred in this District.

29.     Upon information and belief, all of the express warranties that apply to the Aircraft and any repairs thereto require suits to be brought exclusively in the District of Kansas or in Kansas state court. The Limited Warranty states:

> THIS LIMITED WARRANTY SHALL BE CONSTRUED UNDER THE LAWS OF THE STATE OF KANSAS AND ANY DISPUTES AND/OR CLAIMS ARISING THEREFROM SHALL BE EXCLUSIVELY RESOLVED IN THE STATE AND/OR FEDERAL COURTS LOCATED IN WICHITA, KANSAS. THE PARTIES HERETO CONSENT TO PERSONAL JURISDICTION IN THE FORUM CHOSEN.

Ex. D.

#### D.   Applicable law

30.   On information and belief, some or all applicable Textron Aviation warranties require claims "to be construed under the laws of the State of Kansas." *See* Ex. D.

31.   On information and belief, Textron Aviation's design, manufacture, sale, and warranty of all CJ4s took place in and/or was directed from Kansas, and its acts, practices, and omissions regarding the Corrosion Defect were conducted in and directed and emanated from Textron Aviation's headquarters in Kansas.

32.   Kansas law can be applied to the claims of all Class Members because Kansas has a significant contact or significant aggregation of contacts, to both Textron Aviation and the claims of all Class Members, creating state interests, such that application of Kansas law is neither arbitrary nor fundamentally unfair.

33.   In the alternative, the law of the jurisdiction where each Plaintiff and Class Member purchased their Aircraft can apply to their claims.

### IV.   FACTUAL ALLEGATIONS

#### A.   JCC's CJ4 and Harm Suffered Due to the Defect.

34.   JCC owns a 2018 CJ4, Serial No. 525-0274, Tail No. N38MV which was purchased in October 2021 in Wichita, Kansas from Pilatus Leasing, LLC.

35.   The sale of JCC's Aircraft was marketed and facilitated through Textron Aviation under its resale program for owners trading into new Textron Aviation aircraft. Under this program, if a CJ4 owner purchases a new Textron Aviation-manufactured aircraft, Textron Aviation brokers the sale of the owner's original CJ4 without taking a commission. Textron Aviation publicly holds out the resale program as an "all-encompassing" and "seamless" process for purchasing a used aircraft through Textron Aviation.

36.     Although Textron Aviation does not own these pre-owned aircraft, it markets them as Textron Aviation's inventory, permitting customers to "Sign up for updates on our inventory[.]" Textron Aviation's public messaging regarding pre-owned aircraft purchasing touts the process as integrated and customer-supportive, reinforcing that purchasers can reasonably view Textron Aviation as standing behind pre-owned offerings marketed through its channels. Textron Aviation uses the re-sale program to both (a) sell additional aircraft to direct purchasers and (b) reach additional customers in the secondary market of CJ4 sales.

37.     Consistent with typical listings under the resale program, Textron Aviation provided Textron Aviation-branded, professionally prepared marketing materials and specifications for JCC's Aircraft, which highlighted the Aircraft's features and presented it as a desirable and capable business aircraft. Textron Aviation invited JCC's representatives to its Kansas facility in connection with the purchase and hosted them with promotional gestures, including a cake depicting the Aircraft it was purchasing. Textron Aviation representatives served as JCC's primary point of contact through the entire negotiation and purchase process until the day of closing.

38.     As part of the standard re-sale process, Textron Aviation's Mesa Service Center completed a "Pre-Buy Survey" (inspection). Under the survey, Textron was responsible for reviewing aircraft records, conducting an airframe and systems inspection, and identifying discrepancies. Textron Aviation invoiced JCC $1,552.45 for this inspection, which was represented as an assessment of the aircraft's condition and airworthiness. Textron Aviation publicly promotes pre-purchase inspections for pre-owned aircraft purchases and emphasizes that the inspections help buyers anticipate maintenance needs and identify issues "not immediately evident," and that the scope and facility for such inspections are part of the pre-owned

transaction process. To encourage secondary purchasers to engage Textron Aviation and pay it to conduct their pre-buy inspections, Textron Aviation markets that many buyers choose "factory-owned service facilities" for this purpose, including that manufacturer approval "means more confidence on the other end of the transaction."[2]

39.    Textron Aviation sent the Pre-Buy Survey Report to JCC's representative on or about October 19, 2021. Between the Pre-Buy Survey, promotional materials, and interactions with Textron Aviation representatives, Textron Aviation conveyed confidence in the CJ4 line and the specific Aircraft JCC was purchasing. Despite Textron's role as the manufacturer and inspector, and its opportunity to identify issues through this survey, Textron failed to disclose or address the Corrosion Defect that later rendered the aircraft unairworthy and required substantial structural repairs, downtime, and costs. *See* Ex. E. JCC considered these representations and omissions in deciding to complete the purchase.

40.    Plaintiff JCC expected its Cessna CJ4 to be of good and merchantable quality and not defective. Plaintiff JCC had no reason to know, or expect, that the CJ4 had a defect that makes the window frames and aluminum fuselage panels of the Aircraft's cockpit susceptible to severe Corrosion, impacting its safety and structural stability. Plaintiff JCC and the other Class Members justifiably relied on Textron Aviation's representations and omissions regarding the Aircraft and were injured because of their purchase of defective Aircraft. Had they been informed of the presence of the Corrosion Defect, they would not have purchased the Aircraft or would have paid less for it.

---

[2] *Prebuy Inspections Vital to Preowned Aircraft Purchases*, BEECHCRAFT, https://txtav.com/en/journey/articles/articles/prebuy-inspections-vital-to-preowned-aircraft-deals (last visited Dec. 5, 2025).

41.    In the summer of 2025, while undergoing maintenance at Textron Aviation's Indianapolis Service Center, JCC's CJ4 was deemed unairworthy due to corrosion in pressurization-critical structures surrounding the cockpit windshield and side windows, including skin panels and bolt holes.

42.    CJ4s are certified to cruise at altitudes up to 45,000 feet. A sudden depressurization at that altitude would be catastrophic: explosive decompression can cause structural damage, hurl debris through the cabin, and incapacitate crew and passengers, while the thin air at that altitude cannot sustain human life for more than seconds. Hypoxia sets in almost immediately, and without prompt descent and oxygen supplementation, death is the likely result.

43.    On July 29, 2025, Textron Aviation issued Engineering Document DQ49246M1, a recommendation that JCC's CJ4 be ferried under a Special Flight Permit with severe restrictions: the Aircraft had to be flown with its cabin unpressurized, in daytime visual meteorological conditions only, with minimum crew, and avoiding turbulence, icing, and abrupt maneuvers. *See* Ex. F. On August 6, 2025, Textron Aviation made a corresponding "safe for flight" log entry referencing DQ49246M1, and on August 12, 2025, the FAA issued a Special Flight Permit adopting Textron Aviation's limitations and authorizing only a one-time ferry from Indianapolis, Indiana, to Mesa, Arizona. *See* Ex. G; Ex. H. JCC incurred $5,558.65 in direct ferry expenses on August 13, 2025—including fuel, crew transportation, and meals—in addition to lost use of the Aircraft and related costs.

44.    It was necessary for JCC to ferry its CJ4 to the Textron Aviation service center in Mesa, Arizona because Textron Aviation's Service Bulletin states that the repair can only be performed by Textron Aviation owned or authorized service centers. *See* Ex. A.

- 10 -

45.     Once JCC arrived at Textron Aviation's Mesa, Arizona service center, a service representative pulled a paper form from a binder and asked JCC to sign it, describing it only as an acknowledgment that Textron Aviation had received the Aircraft and would begin work. In fact, the document was Textron Aviation's Work Approval Form, which expressly incorporated Textron Aviation's Service Order Terms and Conditions ("Terms and Conditions"). *See* Ex. I. These Terms and Conditions required, among other things, substantial advance deposits, they also allowed Textron Aviation to impose wide-ranging additional charges and storage fees, disclaimed responsibility for deterioration of the Aircraft while in Textron Aviation's possession, limited any warranty to twelve months on parts and six months on labor, capped liability at the price of the service performed, and excluded all consequential, incidental, or punitive damages, even if caused by Textron Aviation's own negligence. Textron Aviation refused to perform the repair outlined in the Service Bulletin—or any repair to the damage caused by the Defect—unless JCC executed this document. JCC declined to sign without review, requested an electronic version, and later received a DocuSign copy, which it reassigned internally and forwarded to counsel.

46.     JCC has declined to sign the Work Approval Form, which contains the Terms and Conditions and release of liability. As a result, JCC's aircraft has remained grounded and unrepaired at Textron Aviation's Mesa, Arizona service center since August 2025.

47.     By conditioning essential repairs on JCC's execution of the Work Approval Form incorporating its Terms and Conditions, Textron Aviation placed JCC under extreme economic and practical duress. Textron Aviation presented JCC with an ultimatum intended to coerce JCC: sign away critical legal protections in order to obtain repairs, or be left indefinitely with a grounded, unairworthy aircraft. This coercive tactic forced JCC into an impossible choice—

either surrender rights and remedies essential to holding Textron Aviation accountable for the Defect, or endure indefinite loss of use of an Aircraft worth at least $9 million, along with mounting storage costs and the risks associated with an unsafe, unusable asset. Textron Aviation's exploitation of its exclusive service network left JCC with no realistic alternative. Based on information and belief, Textron Aviation has employed the same coercive tactics against other Class Members.

48.    Any Class Member who executed the Terms and Conditions did so under circumstances involving extreme economic or practical duress, as well as fraudulent inducement by Textron Aviation. The Terms and Conditions were presented to JCC and other Class Members with the intent of coercing Aircraft owners to sign away their legal rights in order to gain an undue advantage. For many Class Members, the economic impact of having an unusable, unsafe asset would have been too great, effectively depriving them of the free will to reject the release of claims contained in the Terms and Conditions and causing them to act to their detriment by signing away legal claims related to the Defect prior to understanding the full extent and cost of the Corrosion damage. Moreover, Textron Aviation concealed material facts about the repair from Class Members, including the true extent and impact of the Defect, as well as the ultimate cost of the repair, thereby fraudulently inducing Class Members to sign away their legal rights.

49.    When Textron Aviation finally allowed JCC's aircraft to be inspected, it subsequently presented JCC with a repair proposal estimating costs of $544,000.00 to repair damage caused by the Defect.

50.    Plaintiff JCC gave Textron Aviation notice of its claims through multiple channels, including: (a) pre-suit class notice correspondence sent by another Class Member in

June 2025 (*see* Exs. B & C), (b) individual email communications and interactions with Textron Aviation's service personnel and counsel regarding JCC's aircraft, and (c) the filing of litigation against Textron Aviation in Florida in which JCC was an unnamed putative class member (*see CBP Air Logistics LLC v. Textron Aviation, Inc.*, 6:25-cv-01049 (M.D. Fla.)). Collectively, these communications and proceedings gave Textron Aviation actual notice of the Corrosion Defect and the claims asserted herein.

**B.      CBP's CJ4 and Harm Suffered Due to the Defect.**

51.      CBP owns a 2012 CJ4, Serial No. 525C-0073, Tail No. N150RC, which was purchased on October 31, 2023 from a third party in Fort Lauderdale, Florida.

52.      In January 2023, prior to CBP's purchase, Textron Aviation documented corrosion on the right windshield frame of the Aircraft and issued a letter recommending only a restricted ferry flight under unpressurized, Day VMC conditions (meaning a pilot must have sufficient visibility to fly using visual references, such as landmarks and other aircraft, rather than relying on instruments). *See* Ex. J.

53.      Textron Aviation's maintenance records from that same period show that technicians found corrosion in the pilot and copilot windshield-frame fastener holes and performed extensive structural work, including removal and replacement of cockpit skins, sills, and windshield structures. *See* Ex. K; Ex. L. This repair work carried through into the fall of 2023 and materially increased the purchase price.

54.      Prior to its purchase, CBP received brochures and other promotional materials from Textron Aviation promoting the CJ4 line's quality, reliability, and suitability for business use, and Textron Aviation arranged a demonstration flight for CBP in a CJ4. Through these materials and the demonstration, Textron Aviation represented that the CJ4 was a dependable, high-quality aircraft appropriate for CBP's intended use, while failing to disclose the existence of

the Corrosion Defect, the risk of progressive structural damage, and the likelihood of invasive repairs, extended downtime, and substantial costs. CBP reviewed these materials and attended the demo, and Textron Aviation's representations and omissions were a substantial factor in CBP's decision to purchase a CJ4.

55.     Plaintiff CBP expected its Cessna CJ4 to be of good and merchantable quality and not defective. Plaintiff CBP had no reason to know, or expect, that the CJ4 had a defect that makes the window frames and aluminum fuselage panels of the Aircraft's cockpit susceptible to severe Corrosion, impacting its safety and structural stability. Plaintiff CBP and the other Class Members justifiably relied on Textron Aviation's representations and omissions regarding the Aircraft and were injured because of their purchase of defective Aircraft. Had they been informed of the presence of the Corrosion Defect, they would not have purchased the Aircraft or would have paid less for it.

56.     On October 31, 2023, CBP engaged Textron Aviation for a Pre-Buy Survey of Aircraft S/N 525C-0073, for which Textron Aviation charged $25,444.80. *See* Ex. M. CBP paid Textron Aviation for this inspection, which was represented as an assessment of the Aircraft's condition and airworthiness. Under the agreement, Textron Aviation was responsible for reporting discrepancies and notifying the parties of any conditions impacting airworthiness. Despite Textron Aviation's prior, documented knowledge of corrosion and the extensive structural work performed on this same airframe, Textron Aviation failed to disclose its knowledge of the Defect. Additionally, this assessment was a non-invasive visual inspection that did not and could not have revealed corrosion to the window frames, bolt holes, or fuselage panels.

- 14 -

57.    Although CBP relied on the pre-sale repair work and the pre-buy survey conducted by Textron Aviation in purchasing the Aircraft and determining that it was safe to fly, neither the repair nor the survey could resolve or detect the systemic Corrosion Defect. As result, CBP has been left with an Aircraft for which it paid a premium but that is potentially unsafe to fly due to the continued impacts of the Defect.

58.    Plaintiff CBP gave Textron Aviation notice of its claims through multiple channels, including: (a) pre-suit class notice correspondence sent by another Class Member in June 2025 (*see* Exs. B & C) (b) individual email communications and interactions with Textron Aviation's service personnel regarding CBP's aircraft, and (c) the filing of litigation against Textron Aviation in Florida in which CBP was the named class member (*see CBP Air Logistics LLC v. Textron Aviation, Inc.*, 6:25-cv-01049 (M.D. Fla.)). Collectively, these communications and proceedings gave Textron Aviation actual notice of the Corrosion Defect and the claims asserted herein.

### C.    The Cessna Citation CJ4

59.    According to Textron Aviation, the Cessna Citation Jet family represents a cornerstone of the light business jet market, conceived by Cessna Aircraft Company to offer highly efficient and versatile aircraft. The original CitationJet (Model 525) was first delivered in 1993, establishing a legacy of performance and operational economy that quickly became a hallmark of the series.[3] This foundational design prioritized accessibility to a wider range of

---

[3] *See generally* Trautvetter, Chad, Aviation International News, *Cessna says the CJ4 is family's fastest yet*, November 7, 2006 (accessed August 13, 2025) https://fbosurvey.com/aviation-news/business-aviation/2006-11-07/cessna-says-cj4-familys-fastest-yet; Airport Technology, *Cessna Citation CJ4 and Encore Plus Business Jet*, October 27, 2008 (accessed August 13, 2025) https://www.airport-technology.com/projects/cessna_citation_cj4/.

airports through excellent short-field performance and a focus on user-friendly flight characteristics.

60.     The CJ4 was first announced in 2006, with the first prototype CJ4 developed in May 2008. In 2010, the CJ4 received Federal Aviation Administration ("FAA") certification and began delivery to customers. The CJ4 is still in production today.

61.     The first generation CJ4 launched with a price of $9 million. A new CJ4 retails for a minimum of approximately $10 million. Pre-owned CJ4s typically sell for $5–8 million depending on age, hours, and condition. There is an active resale market, with Aircraft available directly from Textron Aviation, including under its resale program, as well as through private transactions and brokerages. Textron Aviation publicly invites buyers to "explore [its] inventory" of pre-owned aircraft and describes purchasing a used aircraft through Textron Aviation as an integrated process.[4] Third-party marketplaces likewise display current inventory advertised by "Textron Aviation" as a seller and provide mechanisms for prospective buyers to compare aircraft and contact the seller.[5]

62.     There are approximately 340 CJ4s currently in operation worldwide, 250 of which are in the United States.

63.     The CJ4 is among the most expensive and sought-after business jets in its class. Recognized for its performance, single-pilot capability, and advanced avionics, the CJ4 commands a significant premium in the light jet market. As such, purchasers of the CJ4 reasonably expect a high level of quality, reliability, and long-term residual value consistent with the Aircraft's price and market position.

---

[4] *Seize the Sky*, BEECHCRAFT, https://txtav.com/en/preowned (last visited Dec. 5, 2025).
[5] *Textron Aviation*, GLOBALAIR, https://www.globalair.com/aircraft-for-sale/listings-by-seller/textron-aviation?brokerid=17337 (last visited Dec. 5, 2025).

64.     In the general aviation industry, and especially for business jets of this class, the expected useful life of an aircraft is at least 30 years, often much longer for privately operated aircraft that accumulate fewer hours than commercial fleets. A properly designed and maintained aircraft, given typical operating conditions, should not experience significant corrosion or degradation of structural components during this period.

**D.      The Nature of the Defect**

65.     All CJ4s were designed and/or manufactured with the Defect, which causes accelerated and extreme corrosion to occur throughout the CJ4.

66.     While the exact cause of the Defect is unknowable without discovery, it is likely caused by a combination of factors, including: improper type or application of moisture sealant on the windshield and cockpit side windows; lack of a sacrificial anode; improper management of static electricity throughout the CJ4; and grounding plates and associated primary structure designed without proper surface protection. These conditions allow moisture incursion and create an electrolytic environment directly on primary structural components.

67.     The CJ4 incorporates a double-paned glass windshield with an internal defogger mechanism. The window frame structure includes grounding plates, which are intended to provide a safe path for electrical currents to exit the structure, prevent static buildup, and reduce the risk of electrical malfunction or structural damage during static discharge events.

68.     The design and/or manufacturing of the defogger, windshield, and/or the grounding plates and associated moisture sealing are defective such that it induces severe Corrosion in the contact areas under and around the grounding plates. This Corrosion can spread to the primary structure (i.e., structures that are load-bearing and flight-critical) of the Aircraft. This Corrosion is often only visible upon disassembly and inspection of the impacted areas.

- 17 -

69.     The Corrosion is not only hidden, it is highly abnormal: no aircraft that is properly designed, manufactured, and maintained in accordance with its operating manual should experience Corrosion on the interior of the window frames under typical operating conditions.

70.     Textron Aviation's own "Specification and Description" publication for the CJ4 claims that "[t]he airframe design incorporates anti-corrosion applications." Ex. D. These applications are not specified by Textron Aviation. However, the existence of Corrosion on the window frames and primary structure of the Aircraft indicate that these "anti-corrosion applications" are either insufficient or nonexistent.

71.     Once initiated, corrosion in these areas accelerates rapidly. Aluminum oxide, the byproduct of aluminum corrosion, is hydrophilic—it attracts and retains moisture—which causes the corrosion to spread faster.

72.     Corrosion of the window frames and aluminum fuselage panels weakens the Aircraft's structure, reducing its ability to withstand the immense pressure and loads encountered during flight, takeoff, and landing. Corrosion has been shown to act as a "crack starter," leading to larger structural cracks that threaten the structural integrity of the airframe.

73.     The Corrosion in the window frames and aluminum fuselage panels of the CJ4 is initially induced by water intrusion or defectively designed grounding plates and manifests in several forms.

74.     The aviation industry and the FAA have identified a number of different corrosion mechanisms and types that are commonly found on aircraft. *See* FAA Advisory Circular AC 43-4B. The types most relevant to the CJ4 are:

a.      **Pitting Corrosion:** The most common effect of corrosion on aluminum and magnesium alloys, appearing as a white or gray powdery deposit. When cleaned, small pits

or holes are visible. The combination of small active anodes and large passive cathodes causes severe pitting.

b.      **Concentration Cell (Crevice) Corrosion:** Occurs in metal-to-metal joints or under faying surfaces where moisture is trapped. An electrical potential between areas of differing ion concentrations causes the anodic area to corrode.

c.      **Fretting Corrosion:** Caused by vibration between two highly loaded surfaces held in contact. The rubbing action removes protective oxide films and exposes bare metal, leading to severe pitting.

75.    In the CJ4, corrosion has been documented in all three forms beneath the grounding plates on primary structure. This is not inevitable. Grounding plates can be designed to corrode sacrificially, sparing the primary structure. Surface treatment of the grounding plates and primary structure can also help prevent Corrosion. Textron Aviation failed to implement sacrificial anodes or adequate surface treatments to protect these critical areas.

76.    Preliminary expert analysis suggests that the Defect's root causes were avoidable through proper design and manufacturing. The combination of inadequate sealing, lack of sacrificial protection, and grounding plate design flaws creates a cascade failure that results in multiple types of severe corrosion on primary structural components.

E.      **<u>Safety Implications of the Defect</u>**

77.    The Defect directly compromises the structural integrity of the CJ4, creating serious flight safety issues. Corrosion in the window frames, windshield structure, and adjacent fuselage panels reduces the ability of these components to withstand the high pressures and loads encountered during normal flight operations.

78.    Corroded structures can develop stress concentrations or "crack starters" that propagate under repeated pressurization cycles. Once cracks form in these critical areas, they can

- 19 -

spread into surrounding structural members, including primary structure, undermining the Aircraft's ability to maintain pressurization and withstand flight loads.

79.    In severe cases, corrosion-weakened window frames could fail entirely during flight, resulting in a blowout of the windshield or cockpit side windows. Such a failure would cause immediate and potentially explosive depressurization. At CJ4 cruise altitudes of up to 45,000 feet, the air is too thin to sustain human life for more than seconds without supplemental oxygen. Rapid depressurization at this altitude can incapacitate or kill occupants before they can don oxygen masks.

80.    A blowout in the cockpit area could also physically eject the pilots from the aircraft, leading to total loss of control. Even if the pilots remained in place, the aerodynamic forces and noise associated with a sudden decompression could make continued control of the Aircraft extremely difficult.

81.    Corrosion and associated cracking in primary structure can also precipitate catastrophic in-flight structural failure. In such a scenario, the pressure of flight or the stresses of take-off or landing could cause the airframe to "unzip," breaking apart while airborne. Either failure mode—a cockpit blowout or structural breakup—would almost certainly be fatal to all occupants.

82.    These dangers are not speculative. The FAA recognizes corrosion in load-bearing primary structure as a serious airworthiness hazard. The types of corrosion identified in CJ4 aircraft—pitting, crevice, and fretting corrosion—are specifically called out in FAA Advisory Circular AC 43-4B as conditions that can severely weaken metallic aircraft structures and lead to catastrophic failure if not properly addressed.

F.        **Textron Aviation Issued a Technical Service Bulletin**

83.        On April 29, 2024, Textron Aviation issued the Service Bulletin. The stated purposed of the repairs outlined in the Service Bulletin ("Service Bulletin Repair") is to "add new windshield ground plates and sealing to the area around the frame of the windshields and cockpit side windows to decrease the potential for moisture incursion." Ex. A.

84.        The Service Bulletin Repair can only be implemented at "Textron Aviation-owned or Textron Aviation-authorized Service Centers." *Id*. There are only eleven such facilities in the United States.

85.        While the repairs outlined in the Service Bulletin are "recommended" by Textron Aviation, they are not required.

86.        Textron Aviation does not advise owners that the Corrosion Defect creates a risk of catastrophic failure or recommend to owners that they cease flying their Aircraft until the Service Bulletin Repair has been completed. Textron Aviation does not mandate the repair or give owners notice that, if left unrepaired, the Defect could adversely impact the airworthiness of the Aircraft.

87.        Out-of-warranty owners report paying approximately $50,000 for the Service Bulletin Repair, exclusive of ferry costs and loss of use. Even this limited work can take weeks or months to schedule and complete, given the limited number of authorized facilities.

88.        If, as a result of Textron Aviation's failure to disclose these risks, an owner does not repair an Aircraft with the Corrosion Defect, the Corrosion will inevitably grow worse, weakening the primary structure of the plane and potentially leading to its failure while in flight or during takeoff or landing.

89.        The Service Bulletin is not a complete repair. In practice, its procedures serve to expose corrosion, remove surface material, and prepare the area for resealing, after which

Textron Aviation often quotes a much more extensive repair (the "Full Corrosion Repair") costing several hundred thousand to over a million dollars and taking six months or more to complete. For example, Plaintiff JCC was quoted $544,000 for the Full Corrosion Repair.

90. The Service Bulletin does not disclose that a large percentage of CJ4s will require such a second-stage repair, often involving replacement of large sections of fuselage structure. Nor does it disclose that Textron Aviation typically conditions partial cost-sharing on execution of a broad release of claims and a non-disclosure agreement. Instead, Textron Aviation implies that the Service Bulletin Repair is a complete fix.

91. Given the seriousness of the Corrosion Defect and true price of the repair, unrepaired Aircraft are reported to lose at least $500,000 in resale value.

92. In isolation, the Service Bulletin Repair not only fails to remediate the dangerous impacts of the Corrosion Defect on the structure of the Aircraft, it can worsen those impacts by removing layers of metal from primary structural components and weakening them significantly.

93. The Service Bulletin Repair removes the surface Corrosion caused by the Defect but negatively impacts the structural strength of the Aircraft. The repairs in the Service Bulletin require the removal of layers of corroded metal from the impacted parts. However, when metal aircraft body components lose even a relatively small amount of thickness, they become weaker and lose "bending stiffness" (i.e., resistance to bending under force) and buckling stiffness (i.e., resistance to sudden loss of structural integrity). For every percentage point of thickness lost, metal loses threefold the amount of bending and buckling stiffness. For instance, if an aircraft body panel loses 6% of its thickness due to Corrosion, its bending stiffness decreases roughly 18%. Because surface treatments often involve surface abrasion using rough sanding operations,

- 22 -

micro stress-risers and surface imperfections are often induced in the sheets, further compromising their strength and stiffness.

94. Without the installation of doublers or complete replacement of the damaged components—neither of which is called for in the Service Bulletin—thinned and corrosion-affected areas remain structurally weaker, even if resealed.

95. If Corrosion is removed from aircraft primary structure without necessary reinforcement, as the Service Bulletin Repair dictates, the repaired Aircraft will retain the structural strength and stability issues caused by the corrosion-weakened primary structure.

96. Additionally, if surface or pitting corrosion is not fully remediated by the repair, it is "sealed" into the Aircraft and will spread to the surrounding areas. Similar to bandaging a wound that has not been properly disinfected, the aluminum oxide in the relevant components attracts water to the existing corroded areas, which causes those areas of corrosion to spread.

97. In short, the Service Bulletin understates the nature and severity of the Defect, omits critical safety warnings, and offers a procedure that is at best a partial measure and at worst an additional risk factor for long-term structural integrity.

G. **Inspection of Repairs to an Aircraft Confirmed Fundamental Problems with the Service Bulletin Repair**

98. On July 16, 2025, an expert retained by Plaintiffs' counsel inspected the ongoing repairs to an Aircraft owned by an absent Class Member being conducted at the Mesa, Arizona Textron Aviation service center. Plaintiffs' expert is Ronald Barrett, a professor of aerospace engineering at University of Kansas with decades of experience in the aviation industry.

99. A preliminary expert analysis of the Aircraft revealed the following insufficiencies:

- 23 -

a.   Evidence of significant pitting, crevice, and fretting Corrosion, indicating water intrusion around the window frames.

b.   Unremediated pitting due to Corrosion on primary structure that appeared to have been prepared for the application of anti-corrosion treatment and re-sealing. If this Corrosion is not removed prior to re-sealing it will inevitably spread, further damaging the primary structure.

c.   Blackened aluminum residues, indicating microscopic buildup of aluminum oxide powders and directional scarring indicating fretting Corrosion.

d.   Metal loss on body components where Corrosion had been removed up to 8.6% of metal thickness. As discussed above, this amount of metal loss will impact the strength and structural stability of the aircraft forebody.

100.   After the completion of this work, the owner of the Aircraft subject to inspection was quoted over $500,000 for the Full Corrosion Repair, which involves replacing large sections of the Aircraft's body components.

### H.   Textron Aviation's Fix Is Costly and Time-Consuming

101.   Owners report that, following the Service Bulletin Repair, Textron Aviation presents them with a quotation for the Full Corrosion Repair. Owners report having to pay anywhere from several hundred thousand dollars to over $1 million for the Full Corrosion Repair, depending on the severity of the Corrosion and the scope of the work required. While the Service Bulletin Repair focuses on the immediate area around the windshield and window frames, the Full Corrosion Repair often requires owners to replace large sections of the body of their aircraft.

102.   Plaintiffs' experiences with the Defect and Textron Aviation illustrate the same problems faced by other CJ4 owners. For several weeks, Textron Aviation refused to proceed

- 24 -

with the necessary inspections and repairs on either JCC's Aircraft unless it executed Textron Aviation's standard Work Authorization containing Terms and Conditions which purport to limit owners' rights and release Textron Aviation from liability resulting from the repair. As a result, JCC's Aircraft has remained unrepaired for several months, leaving it unable to be flown, and with continuing corrosion exposure and mounting costs.

103. Likewise, while CBP's Aircraft received some corrosion-related maintenance work prior to CBP's purchase, Textron Aviation has not acknowledged that this maintenance work was related to the Defect. CBP has no way to ensure that its Aircraft is safe to fly without subjecting itself to the release of liability contained in Textron Aviation's Terms and Conditions and facing potentially astronomical repair costs.

104. Currently, some owners report having to schedule the Full Corrosion Repair more than a year out, given the limited capacity of authorized Textron Aviation service centers. Textron Aviation claims that, during this period, the structurally compromised Aircraft can still be flown. However, as pitting and fretting corrosion are known to induce microscopic stress risers and structural cracks, this creates a potentially dangerous situation for the owners of these Aircraft.

105. Once an Aircraft goes in for service, the lead time and Full Corrosion Repair itself can take six months or more. For instance, the proposed repairs on one Class Member's Aircraft are estimated to require 30 days of lead time and 120 days for the repair itself. These estimates do not include the time for initial repairs and assessment of the Aircraft, a process that itself takes weeks or months. During this time, the Aircraft will be unusable.

106. Upon information and belief, in certain cases, Textron Aviation will partially cover the cost of the Full Corrosion Repair (up to 35%) if the Class Member signs an agreement

containing a release of claims against Textron Aviation and a non-disclosure provision. Even if Textron Aviation chooses to provide this option to a Class Member, the Class Member is still responsible for a minimum of $325,000.

107.    In addition, Textron Aviation's expensive and time-consuming Full Corrosion Repair process does not fully address the Corrosion Damage. Textron Aviation's inspection relies upon a combination of (i) the naked eye, (ii) manually feeling for any pits, and (iii) eddy current detection. These techniques lag industry standards and are not capable of fully identifying corrosion damage. Textron Aviation does not use microscopy, which is industry standard and is the only reliable way to determine the presence of corrosion that is not visible to the naked eye. Accordingly, there is a serious risk that Textron Aviation has certified or will certify airplanes as airworthy despite corrosion damage on parts where the corrosion has gone unidentified by Textron Aviation and thus unrepaired. Such corrosion can continue to spread and further compromise the aircraft's integrity.

108.    Finally, even where Textron Aviation entirely replaces parts that are subject to visible corrosion, there is no indication that they have fixed the underlying design flaw. Even owners who have undergone the Full Corrosion Repair, therefore, have at best simply reset the clock on their CJ4's susceptibility to corrosion damage.

109.    Furthermore, Textron Aviation prevents owners whose CJ4 have previously received the Full Corrosion Repair from having their planes inspected at Textron Aviation facilities to determine whether there has been a recurrence of Corrosion Damage. For example, CBP has requested multiple times that Textron Aviation coordinate inspection of N150RC to evaluate it post-repair. Textron Aviation has refused to do so.

**I.**    **Textron Aviation's Express Warranty Does Not Remedy the Defect**

110.    Every Aircraft comes with the Limited Warranty, a five-year/5,000 flight-hour warranty which covers the Aircraft's airframe, components, and avionics. *See* Ex. D.

111.    On information and belief, the Service Bulletin Repair is provided free-of-charge for owners within the Limited Warranty period for the Aircraft. For owners outside of the five-year/5,000 flight-hour window, the Service Bulletin Repair costs approximately $50,000.

112.    However, on information and belief, Textron Aviation has improperly refused to cover the Full Corrosion Repair, even for Aircraft that are still under warranty. This repair costs anywhere from several hundred thousand dollars to over $1 million, and typically requires the Aircraft to be out of service for many months.

113.    Additionally, while the process leading to significant Corrosion begins within the warranty period, in most Aircraft the Corrosion Defect only becomes widespread after the expiration of the Limited Warranty.

114.    As outlined below, on information and belief Textron Aviation knew that the Defect existed from prior to the first release of the Aircraft and concealed the Defect in order to minimize the volume of repairs covered by the Limited Warranty.

115.    The Limited Warranty, moreover, fails of its essential purpose because it fails to fully cover all repairs necessitated by the Corrosion Defect, which is a condition that begins within the warranty period and is entirely caused by Textron Aviation's insufficient design and manufacturing of the Aircraft.

**J.**    **Textron Aviation's Knowledge of the Corrosion Defect**

116.    On information and belief, as early as 2009, and likely earlier, Textron Aviation knew or should have known of the Corrosion Defect through exercise of reasonable care, and/or

- 27 -

was negligent in failing to be aware of the Corrosion Defect, and/or was reckless in not knowing of the Corrosion Defect based on, among others, the following sources:

a.     Pre-release design, manufacturing, engineering, and testing data;

b.     Textron Aviation service center employees' familiarity with and knowledge of the Corrosion Defect;

c.     The Service bulletin sent by Textron Aviation to owners and service centers, which evinces knowledge of the Corrosion Defect; and

d.     Reports made by Textron Aviation to the Federal Aviation Administration pursuant to various reporting requirements.

117.   At a minimum, Textron Aviation had information about the Corrosion Defect that was material to purchasers but not available to the public.

### 1. Textron Aviation's Knowledge of the Corrosion Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data

118.   While the precise cause of the Corrosion Defect is unknown to Plaintiffs and unknowable prior to discovery, such Corrosion would not occur in the absence of a manufacturing and/or design defect. The Corrosion is most likely caused by a combination of issues, including ineffective sealant used on the cockpit window and windshield, poorly designed grounding plates, and/or the absence of a "sacrificial anode" designed to divert corrosion from and protect the primary structures. The combination of these insufficiencies likely creates a cascade failure resulting in the Corrosion Defect and exacerbated associated repair costs.

119.   Pre-release testing should have revealed some or all of these design and/or manufacturing insufficiencies. Textron Aviation would have performed these tests and thus should have been aware of the design and/or manufacturing deficiencies. For instance, qualification testing should have been performed on the window sealant to ensure that it was the

correct composition for the windshield with suitable adhesion and resistance to moisture penetration properties. Such testing should have revealed incompatibility between the sealant and the windshield material that could potentially lead to water intrusion.

120.    Likewise, the inclusion of a sacrificial anode and protection on the surface of the grounding plates are basic design elements meant to protect the aircraft primary structure from known sources of corrosion. The lack of these elements in the design of the Aircraft—which would have been known to Textron Aviation but not to customers—indicates that Textron Aviation was negligent or reckless in not taking basic measures to prevent dangerous Corrosion on the Aircraft.

**2.      Textron Aviation Knew of the Corrosion Defect Based on the Experiences of Its Service Centers and as Evidenced by Its Own Service Bulletin**

121.    Textron Aviation runs 11 service centers in the United States and 28 mobile service units. There are an additional 12 of these service operations located outside of the United States. These facilities are either owned or overseen directly by Textron Aviation.

122.    On information and belief, any work pursuant to the Service Bulletin or under Textron Aviation's warranties must be completed by one of these authorized service providers. The Service Bulletin Repair can only be completed at a Textron Aviation service center.

123.    Given that the Corrosion Defect is visible only on inspection by a trained mechanic, Textron Aviation service center employees would have been among the first to discover the tendency for the CJ4 to corrode around the cockpit window frames.

124.    To be airworthy, Aircraft in the U.S. must be regularly inspected on a schedule set by the manufacturer.[6] The schedule for the CJ4 is broken out into five phases dictated by time or

---

[6] CENTRAL FLYING SERVICE, https://central.aero/cessna-citation-maintenance-what-owners-need-to-know-about-inspections-upgrades-downtime/ (last visited August 2, 2025).

- 29 -

flight hours. In phase five, which Textron Aviation refers to as "heavy inspection," the structural integrity of the Aircraft would be examined. A phase five inspection occurs every 36 months or 1,200 flight hours, whichever comes first. During these phase five inspections, a trained mechanic would have found evidence of the Corrosion Defect. Prior to the issuance of the Service Bulletin, it is likely that the Corrosion was regularly discovered on these Aircraft by both technicians directly employed by Textron Aviation and by independent aircraft mechanics who would have informed Textron Aviation of the Defect. For example, CBP's aircraft first underwent inspection and repair of the Corrosion Defect at a Textron Aviation facility in January of 2023, over a year before the Service Bulletin was released.

125. Knowledge of the Defect is evinced by Textron Aviation's release of the Service Bulletin in April 2024, which states that the purpose of the Repair is to "decrease the potential for moisture incursion." Ex. A at 20.

126. The Service Bulletin also states that "Textron Aviation recommends that compliance with all service documents is reported to a maintenance tracking system provider." *Id*. at 8. This tracking information would have revealed how severe and widespread the issue truly is.

        **3.**       **<u>Textron Aviation and Its Service Centers Were Required to Report the Corrosion Defect to the FAA</u>**

127. Federal law subjects aircraft manufacturers to stringent oversight by the Federal Aviation Administration ("FAA").

128. Service centers operated by Textron Aviation are required by law to report defect occurrences to the FAA, including those involving "[a] significant aircraft primary structural defect or failure caused by any autogenous condition (fatigue, understrength, corrosion, etc.)." 14 C.F.R. § 21.3(c)(8). In addition, Textron Aviation is required to notify the FAA of "[a] condition

in a product, part or appliance that could result in a finding of unsafe condition by the Administrator[.]" 14 C.F.R. § 183.63(b)(1).

129.   On information and belief, either Textron Aviation complied with these reporting obligations, which will likely show its awareness of the Corrosion Defect shortly after the release of the CJ4 in 2010, or it failed to report instances of Corrosion to the FAA and would therefore have been reckless or negligent in its failure to track and report instances of Corrosion in the Aircraft.

### K.   Textron Aviation's Marketing and Concealment

130.   Textron Aviation designed, manufactured, sold, and warranted the CJ4 with the Corrosion Defect, while willfully concealing the potentially life-threatening nature of the Defect, as well as the inferior quality of the CJ4.

131.   In marketing materials, Textron Aviation repeatedly touted the structural integrity of its windows and surrounding airframe, assuring customers that these features were protected against corrosion and related structural defects. For example, the "Specification and Description" publications for the CJ4 highlight the "stainless steel retaining structure" surrounding the windows and windshield as providing "structural continuity," and claim that "[t]he airframe design incorporates anti-corrosion applications[.]" Ex. D. They also tout systems to limit moisture on the Aircraft's windows and windshield, noting that the windows and windshield are "electrically heated" and have "electrical anti-icing and defogging" system, as well as "water repellent coating." *Id.*

132.   Other marketing materials, in addition to highlighting the same features, emphasize the company's commitment to address problems with its aircraft, and ability to offer prompt and effective repairs. For instance, a brochure introducing the CJ4 similarly touts that the "[n]ew windshield and cockpit side windows are **heated glass** and sweep gracefully back to the

canopy." It further boasts that Textron Aviation offers "the highest-rated service program in business aviation" and "an industry-leading warranty." It goes onto promise "[a] lasting commitment to Citation owners" stating that it is "a company with unsurpassed resources, expertise, longevity, and reach to ensure your business jet ownership is the best experience it can be, now and for the lifetime of your new Citation."

133.    A "product card" for the CJ4 further emphasized Textron Aviation's supposedly first-class repair and service capabilities, stating that "Anytime. Anywhere. You're supported by the industry's most capable network."

134.    An April 23, 2023, press release from Textron Aviation regarding the Gen 2 CJ4 states that "Cessna Citations are renowned for combining reliability, efficiency and comfort with class-leading performance[.]"

135.    As early as 2006, Textron Aviation was marketing the CJ4 as a state-of-the-art aircraft. For instance, a November 7, 2006 article quotes a Cessna product marketing manager as stating that the CJ4 "has the strongest performance and payload balance in its class while offering benchmarking standard features and amenities."[7]

136.    None of these materials state that CJ4s are susceptible to severe, dangerous Corrosion on the window frames and the body of the plane that costs, at a minimum, hundreds of thousands of dollars to repair. Nor do these materials state that Textron Aviation's service program will require three months or more to fully repair these Aircraft, combined with long lead times of in some cases over a year. Rather, they falsely represent that the CJ4 is a high-quality,

---

[7] Chad Trautvetter, *Cessna says the CJ4 is family's fastest yet*, Aviation International News, Nov. 7, 2006 https://fbosurvey.com/aviation-news/business-aviation/2006-11-07/cessna-says-cj4-familys-fastest-yet (last visited Aug. 21, 2025).

dependable product with an associated service network capable of providing speedy and comprehensive repairs.

137.    In addition to these general marketing materials, Class Members who purchased or leased used or new CJ4s were often provided materials about the specific Aircraft they intended to purchase. For instance, JCC was presented with custom marketing materials related to the CJ4 it intended to purchase by Textron Aviation employees and representatives of JCC attended a promotional event celebrating JCC's CJ4 purchase. Likewise, prior to its purchase through a third party, CBP had extensive contact with Textron Aviation, which provided it with materials about the CJ4 line and arranged a demo flight of a CJ4 for CBP's representatives. At no point in its marketing and sales activities did Textron Aviation reveal to JCC or CBP (or any potential buyers in a similar position) that the Corrosion Defect exists or that it poses a serious risk to the integrity and airworthiness of the Aircraft.

138.    Textron Aviation's involvement reaches purchasers and lessees of used CJ4 aircraft, not only buyers of new aircraft. Textron Aviation's resale program markets to prospective purchasers and positions Textron Aviation as a central, supportive actor in the pre-owned acquisition process.[8] Textron Aviation's has a "Pre-Owned Direct team" that offers services designed to support pre-owned transactions, including a "Market Assist" program leveraging Textron Aviation's network of sales experts to help operators sell aircraft, and "in-house market analysts" who provide aircraft valuations "backed by fleet information exclusive to the OEM."[9]

---

[8] *Prebuy Inspections Vital to Preowned Aircraft Purchases*, BEECHCRAFT, https://txtav.com/en/journey/articles/articles/prebuy-inspections-vital-to-preowned-aircraft-deals (last visited Dec. 5, 2025).
[9] *Id.*

139.    When Class Members—including JCC and CBP—received Textron Aviation-provided aircraft-specific marketing materials, sales touchpoints, and pre-buy inspection services, Textron Aviation was communicating in a posture meant to influence secondary-market purchase decisions while allegedly withholding material information from "potential buyers" in those transactions.

140.    Textron Aviation also encourages buyers in both the direct and secondary markets to purchase maintenance contracts directly from Textron Aviation, including but not limited to the ProTech and ProParts programs. Textron Aviation markets that these programs help "manage your maintenance costs . . . and optimize the resale value of your aircraft."[10] Textron Aviation derives additional benefit from secondary market sales from these programs.

141.    In sum, Textron Aviation has improperly concealed the Corrosion Defect from customers and the serious safety issues it causes, and has misrepresented the safety and flightworthiness of the Aircraft.

142.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the specific names and identities of those individuals at Textron Aviation responsible for disseminating false and misleading marketing materials regarding the Aircraft. Textron Aviation is necessarily in possession of all of this information.

143.    With respect to Textron Aviation's fraudulent concealment there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. At all relevant times, including specifically prior to and at the time it purchased its Aircraft, Textron Aviation had information about the risk of Corrosion in the Aircraft that was not known to the

---

[10] *ProAdvantage Programs*, TEXTRON AVIATION, https://txtav.com/en/proadvantage-programs (last visited Dec. 8, 2025).

public, and/or was reckless in not knowing such information; Textron Aviation was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its active concealment of it; and Textron Aviation never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

144.    In addition to the above, Plaintiffs make the following specific fraud allegations:

a.    **Who:** Textron Aviation actively concealed the Corrosion Defect from Plaintiffs and the other Class Members while simultaneously touting the quality and dependability of the Aircraft generally, and its windows and windshield frames and moisture control systems specifically, as well as the repair capabilities of its authorized service network, as alleged in § IV.J. Textron Aviation also concealed the true nature and severity of the Defect by offering a Service Bulletin Repair that did not fully repair the Defect or acknowledge its true severity and impact on the safety of the Aircraft. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Textron Aviation responsible for such decisions. However, Plaintiffs have interacted with a number of Textron Aviation service representatives who have concealed information from them as to the severity and true impact of the Defect.

b.    **What:** Textron Aviation knew that the Aircraft contained the Corrosion Defect, or at a minimum had material information regarding the Corrosion Defect that was not available to the public, starting no later than 2009, as alleged above in § IV.J. Textron Aviation concealed the Defect and made representations about the safety, world-class quality, and other attributes of the Aircraft, as specified above in § IV.K.

c.    **When:** Textron Aviation concealed material information regarding the Corrosion Defect at all times and made representations about the quality and durability of the

Aircraft, and the responsiveness of its authorized service network, starting no later than 2009, continuing through the time of sale, and on an ongoing basis, and continuing to this day, as alleged above in § IV.J. Although Textron Aviation has released the Service Bulletin, it continues to conceal the true nature and severity of the Defect.

d.       **Where:** Textron Aviation concealed material information regarding the true nature of the Corrosion Defect in every communication it had with Plaintiffs and the other Class Members and made representations about the quality and durability of the Aircraft, and the responsiveness of its authorized service network. Plaintiffs are aware of no document, communication, or other place or thing, in which Textron Aviation exposed the true nature and severity of the Defect to anyone outside of Textron Aviation. Such information is not adequately disclosed in any sales documents, advertisements, warranties, owner's manuals, or on Textron Aviation's website.

e.       **How:** Textron Aviation concealed the Corrosion Defect from Plaintiffs and the other Class Members and made representations about the quality and durability of the Aircraft, and the responsiveness of its authorized service network. Textron Aviation actively concealed the truth about the severity and nature of the Corrosion Defect from Plaintiffs and the other Class Members at all times, even though it knew about the Corrosion Defect and knew that information about the Corrosion Defect would be important to a reasonable consumer, and Textron Aviation promised in its marketing materials that the Aircraft have qualities that they do not have.

f.       **Why:** Textron Aviation actively concealed material information about the Corrosion Defect in the Aircraft for the purpose of inducing Plaintiffs and the other Class Members to purchase the Aircraft, rather than purchasing or leasing competitors' aircraft, and

made representations about the quality and durability of the Aircraft and the responsiveness of its authorized service network. Had Textron Aviation disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and the other Class Members (all reasonable consumers) would have been aware of it, and would not have bought the Aircraft or would have paid less for them. Furthermore, Textron Aviation actively concealed the Corrosion Defect to avoid liability for the full costs associated with the defect. Textron Aviation also actively concealed Corrosion Defect in the Aircraft for the purpose of inducing Plaintiffs and the other Class Members to execute full releases of liability to obtain timely repair of their Aircraft at a "discounted" cost.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment Tolling

145.   Textron Aviation has known of the Corrosion Defect in the Aircraft since at least 2009, and certainly well before Plaintiffs and the other Class Members purchased their Aircraft, and yet concealed from or failed to disclose to Plaintiff, Class Members, and the public the full and complete nature of the Corrosion Defect. To this day, Textron Aviation conceals the full extent of the Defect, its potential safety impacts, and the extent of the repairs that would be required to fully remediate the damage caused by the Defect and ensure that the Aircraft are safe to operate.

146.   Any applicable statute of limitation has been tolled by Textron Aviation's ongoing knowledge, active concealment, and denial of the facts alleged herein.

### B.   Estoppel

147.   Textron Aviation is and has been under a continuous duty to disclose to Plaintiffs and the other Class Members the true character, quality, and nature of the Aircraft. Textron Aviation actively concealed – and continues to conceal – the true character, quality, and nature

- 37 -

of the Aircraft and knowingly made misrepresentations about the state-of-the-art quality and features of the Aircraft, including the windshield, defogging system, and corrosion-protection features. Plaintiffs and the other Class Members reasonably relied upon Textron Aviation's knowing misrepresentations and active concealment of these facts. Based on the foregoing, Textron Aviation is estopped from relying on any statutes of limitation in defense of this action.

### C.      Discovery Rule

148.    The causes of action alleged herein did not accrue until Plaintiffs and the other Class Members discovered that their Aircraft contained the Corrosion Defect.

149.    Plaintiffs and the other Class Members had no realistic ability to discern that the Aircraft were defective until – at the earliest – the release of the Service Bulletin on April 29, 2024 and a subsequent inspection to confirm that the Aircraft in question had developed Corrosion in the cockpit window frames and aluminum fuselage panels, which would not be visible to the naked eye. Even if a Class Member discovered the Corrosion Defect as a result of an inspection, Textron Aviation actively concealed the true severity and safety impact of the Defect such that Class Members could not understand its true nature.

150.    Thus Plaintiffs and the other Class Members were not reasonably able to discover the Corrosion Defect until after they had purchased their Aircraft, despite their exercise of due diligence, and their causes of action did not accrue until they discovered not only that their Aircraft had developed Corrosion in the windows and on the aluminum fuselage panels, but that the Service Bulletin Repair does not remedy the Defect as promised.

## VI.      CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated individuals as a class under Kansas law pursuant to Federal Rule of Civil Procedure 23(a), as well as subparts (b)(2), (b)(3), and (c)(4).

152.     Plaintiffs bring this class action as a class under Kansas law (or, in the alternative, under the law of each Plaintiff's jurisdiction of purchase) on behalf of themselves and all other similarly situated individuals, defined as follows: All current or former owners of a Cessna Citation CJ4. Excluded from the Class are: (1) employees of Textron Aviation, Inc.; (2) any judge assigned to this case and their respective families; (3) government entities; and (4) all claims for wrongful death and/or personal injury, emotional distress, and damage to property other than the Aircraft itself.

### A.     Rule 23(a) is Satisfied

153.     This action satisfies the commonality, numerosity, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a).

#### 1.     Commonality

154.     There are several questions in this case with answers common to the class that will drive the resolution of this case, including the following:

a.     whether CJ4s have a Defect in the cockpit window frames, windshield, and grounding plates that causes Corrosion throughout the primary structure of the Aircraft;

b.     whether Textron Aviation breached its express warranties to Plaintiffs and Class Members by supplying Aircraft with the Corrosion Defect and refusing to repair the Aircraft under warranty;

c.     whether the Aircraft were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

d.     whether and when Textron Aviation knew or should have known about the Corrosion Defect, and, if so, how long Textron Aviation knew or should have known of the Defect;

e.    whether Textron Aviation had and/or has a duty to disclose the Corrosion Defect to Plaintiffs and the other Class Members;

f.    whether Textron Aviation omitted and failed to disclose material facts about the Aircraft of which it had superior knowledge;

g.    whether Plaintiffs and the other Class Members were damaged at the point of sale by overpaying for Aircraft they believed to be safe, durable, and not defective;

h.    whether Plaintiffs and other Class Members were damaged by paying out-of-pocket for repairs and whether they are entitled to free repair of the Corrosion Defect and/or reimbursement for out-of-pocket repairs already made;

i.    whether Textron Aviation subjected Plaintiffs and Class Members to fraudulent inducement and/or extreme economic and practical duress by conditioning necessary Defect-related repairs on Class Members' signature of releases of liability without disclosing the extent or nature of the Defect to Class Members, and whether those releases are therefore null and void as a matter of public policy.

### 2.    Numerosity

155.    On information and belief, Textron Aviation knows the exact number of CJ4 Aircraft that it has sold. While Plaintiffs do not currently know this exact number, their current research indicates that it is at least 340 Class Members: large enough such that joinder is impracticable.

156.    The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily ascertainable from information and records in Textron Aviation's possession, custody, or control, as well as from records kept by the Federal Aviation Administration, and can readily self-identify.

### 3.    Typicality

157.    The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, purchased Aircraft designed, manufactured, and distributed by Textron Aviation. Plaintiffs, like all Class Members, have been damaged by Textron Aviation's misconduct in that they purchased Aircraft they would not have purchased, or for which they would have paid less, and incurred or will incur the cost of service relating to and caused by the Corrosion Defect and/or have experienced diminished ability to use their Aircraft for their ordinary and intended purpose. Furthermore, the factual bases of Textron Aviation's misconduct are common to Plaintiffs and all Class Members and represent a common thread of misconduct resulting in injury to Plaintiffs and all Class Members. In short, the claims of Plaintiffs and Class Members are based on the same legal and remedial theories and arise from the same pattern of conduct by Textron Aviation, satisfying the typicality requirement.

### 4.    Adequate Representation

158.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs own CJ4s and have therefore been injured by the Corrosion Defect. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving technologically complex defective products.

159.    There is no fundamental conflict of interest between Plaintiffs and Class Members. Any potential conflicts among Class Members are speculative or so minor that they will not interfere with the adequacy of Plaintiffs as class representatives.

160.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and they have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

**B.**     **The Requirements of Rule 23(b)(3) and 23(c)(4) Are Satisfied**

   **1.**     **Predominance and Superiority**

161.     There are numerous questions of law and fact common to Plaintiffs and the other Class Members, the answers to which will advance the resolution of the litigation as to all Class Members and which predominate over any individual questions.

162.     Plaintiffs and the other Class Members have all suffered and will continue to suffer harm and damages as a result of Textron Aviation's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

163.     Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. This is so because, even if individual damages are significant, the cost of litigating such a technically complex case effectively is likely to be higher than such damages. Absent a class action, Class Members will continue to incur damages, and Textron Aviation's misconduct will continue without remedy.

164.     The concealed safety risks described above counsel in favor of swiftly and efficiently managing this case as a class action, which preserves judicial resources and minimizes the possibility of serial or inconsistent adjudications. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the court and the litigants and will promote consistency and efficiency of adjudication.

165.     In the alternative, there are many particular claims, issues, and common questions of law and fact appropriate for certification for classwide adjudication under Rule 23(c)(4).

**C.**      **Rule 23(b)(2) Is Satisfied**

166.    Class Members seek declarations that there is an inherent design and/or manufacturing flaw in the Aircraft, that the warranties extend to them, and that they are entitled to final equitable relief in the form of a program providing notice to Class Members of the Defect and free, regular inspections. The requirements of Rule 23(b)(2) are satisfied since the claim for declaratory relief is based upon Textron Aviation's systemic policies and practices, making final declaratory relief with respect to the class as a whole appropriate. Namely, Textron Aviation has a practice of concealing the true nature and scope of the Corrosion Defect from Plaintiffs and Class Members; a practice of issuing misleading marketing and advertising that works to conceal the true defective nature of the Aircraft; a policy of not honoring the terms of its own (deficient) Limited Warranty; and a policy of requiring Plaintiffs and Class Members to pay the bulk of the cost of repairing the Corrosion Defect, a condition which has been caused solely by Textron Aviation's errors in the design and manufacturing of the Aircraft.

167.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(2), because Textron Aviation has acted on grounds generally applicable to the Class through its concealment of the Corrosion Defect, and refused to act on grounds generally applicable to the Class, by refusing to remedy the Corrosion Defect for all Class Members free of cost, thereby making appropriate final relief with respect to the Class as a whole.

168.    Plaintiffs and Class Members seek, among other relief, equitable remedies and declaratory relief with respect to the Class as a whole, as outlined below in § VIII.

**VII.    CLAIMS FOR RELIEF**

**COUNT I**
**BREACH OF EXPRESS WARRANTY**
**(Kan. Stat. Ann. § 84-2-313)**

169.    Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

170.    Plaintiffs bring this claim on behalf of themselves and the Class.

171.    Textron Aviation is and was at all relevant times a "seller" as that term is used in Kan. Stat. Ann. § 84-2-313.

172.    Plaintiffs and Class Members are either "buyers in the ordinary course of business" as that term is used in Kan. Stat. Ann. § 84-1-201(b)(9) and/or "consumers" as that term is used in Kan. Stat. Ann. § 84-1-201(11).

173.    The Aircraft are and were at all relevant times "goods" as the term is used in Kan. Stat. Ann. § 84-2-313 and Kan. Stat. Ann. § 84-2-105(1).

174.    Plaintiffs and the other Class Members bought Aircraft manufactured and marketed to them by Textron Aviation intended to be purchased by buyers in the ordinary course of business such as them.

175.    Textron Aviation expressly warranted the Aircraft against defects, including the Corrosion Defect, within the meaning of Kan. Stat. Ann. § 84-2-313, through its Limited Warranty, which states that Textron Aviation "expressly warrants each new Citation CJ4 Aircraft … to be free from defects in material and workmanship under normal use and service to the first user[.]" Ex. D.

176.    Textron Aviation's express warranties formed the basis of the bargain that was reached when Plaintiffs and the other Class Members purchased their Aircraft.

177.    As described above, the Corrosion Defect existed in the Aircraft at the time they were produced and results in the development of Corrosion, the early stages of which begin before the expiration of the warranty period.

178.   The Corrosion Defect substantially impairs the use, value, and safety of the Aircraft to reasonable consumers and buyers in the ordinary course of business, including Plaintiffs and the other Class Members.

179.   Textron Aviation breached its express warranties by supplying the Aircraft to Plaintiffs and the other Class Members with the Corrosion Defect. This breach violated Kan. Stat. Ann. § 84-2-313.

180.   Textron Aviation knew of the Corrosion Defect—and that the Defect poses a serious safety risk to consumers and buyers in the ordinary course of business like Plaintiffs and the other Class Members—when it expressly warranted against the Defect, wrongfully and fraudulently concealed material facts regarding the Defect, and induced Plaintiffs and the other Class Members to purchase the Aircraft under false and/or fraudulent pretenses.

181.   Textron Aviation breached its express warranty as to the Aircraft because it failed to: (1) fully repair the Aircraft, which it knew or should have known were defective at the time of sale, to remove Corrosion, ensure the structural stability of the Aircraft, and make the Aircraft resistant to Corrosion in ordinary and expected use; or (2) diagnose and repair the Aircraft experiencing Corrosion at no cost to Plaintiffs and Class Members.

182.   Textron Aviation was provided with appropriate notice: a) pre-suit class notice correspondence sent by a Class Member in June 2025 (*see* Exs. B & C), (b) individual email communications and interactions between Textron Aviation's service personnel and counsel regarding Plaintiffs' and Class Members' Aircraft, and (c) the filing of litigation against Textron Aviation in Florida regarding the Defect (*see CBP Air Logistics LLC v. Textron Aviation, Inc.*, 6:25-cv-01049 (M.D. Fla.)). In response, Textron Aviation has not denied the existence of the Corrosion Defect, nor explained why it should not be liable for covering the full cost of all

repairs beyond generalized denials of legal liability, nor offered owners full repairs free of charge. Therefore, Plaintiffs gave Textron Aviation a reasonable opportunity to cure its failures with respect to its express warranties, and Textron Aviation failed to do so in a manner that properly compensated Plaintiffs and Class Members for all economic damages they incurred or will incur as a result of the Corrosion Defect.

183.    The Limited Warranty fails in its essential purpose because the contractual remedy of repair/replacement is insufficient to make Plaintiffs and Class Members whole; because Textron Aviation concealed the Corrosion Defect for years, so that Class Members could not bring warranty claims within the warranty period; and because Textron Aviation failed and/or refused to adequately provide the promised remedies within a reasonable time.

184.    Any attempt by Textron Aviation to limit or disclaim the warranties in a manner that would exclude coverage of the Corrosion Defect is unconscionable as a matter of law because the relevant transactions were tainted by Textron Aviation's knowledge and active concealment and/or omission of material facts. Textron Aviation knew when it first made these warranties and their limitations that the Corrosion Defect existed and that the warranties would expire before a reasonable consumer would notice, observe, or discover the Defect. Thus, any such effort by Textron Aviation to disclaim or otherwise limit its liability for the Corrosion Defect is null and void as a matter of public policy.

185.    As a direct and proximate result of Textron Aviation's breach of its express written warranties, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Aircraft to a safe condition, the costs of needed present and future repairs, an inability to

use the Aircraft for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determined at trial.

186.   Plaintiffs seek against Textron Aviation equitable relief, declaratory relief, actual damages, and attorneys' fees and expenses.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Kan. Stat. Ann. § 84-2-314)

187.   Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

188.   Plaintiffs bring this claim on behalf of themselves and the Class.

189.   Textron Aviation is and was at all relevant times a "seller" as that term is used in Kan. Stat. Ann. § 84-2-314.

190.   Plaintiffs and Class Members are either "buyers in the ordinary course of business" as that term is used in Kan. Stat. Ann. § 84-1-201(b)(9) and/or "consumers" as that term is used in Kan. Stat. Ann. § 84-1-201(11)

191.   The Aircraft are and were at all relevant times "goods" as the term is used in Kan. Stat. Ann. § 84-2-314 and Kan. Stat. Ann. § 84-2-105(1). Textron Aviation was a "merchant with respect to goods of that kind" as the term is used in Kan. Stat. Ann. § 84-2-314(1).

192.   Plaintiffs and the other Class Members bought Aircraft manufactured and marketed to them by Textron Aviation and that Textron Aviation intended to be purchased by buyers such as them.

193.   Pursuant to Kan. Stat. Ann. § 84-2-314, a warranty that the Aircraft were in merchantable condition was implied by law, and the Aircraft were bought and sold subject to an implied warranty of merchantability.

- 47 -

194.   When it sold the Aircraft, Textron Aviation extended an implied warranty to Plaintiffs and Class Members that the Aircraft were merchantable and fit for the ordinary purpose for which such goods were sold and that they would pass without objection in the trade.

195.   Plaintiffs and the other Class Members who purchased an Aircraft from Textron Aviation are entitled to the benefit of their bargain: an aircraft that has been properly designed and manufactured to resist Corrosion stemming from ordinary and expected use, and that does not render the aircraft too dangerous to operate.

196.   Textron Aviation breached this implied warranty in that the Aircraft are (1) not fit for ordinary use; (2) not of a merchantable quality; and (3) would not pass without objection in the trade.

197.   Had Textron Aviation disclosed the existence of the Corrosion Defect at the time of sale, Plaintiffs and the other Class Members would not have purchased the Aircraft or would have purchased them at a lower price.

198.   To the extent that Plaintiffs and the other Class Members lack privity of contract with Textron Aviation, no privity is required because:

a.   By extending express written warranties to end-user purchasers, Textron Aviation brought itself into privity with Plaintiffs and Class members;

b.   Class Members are third-party beneficiaries of any warranties covering the Aircraft; and

c.   The Corrosion Defect poses a serious safety risk to the Aircraft's owners, operators, and passengers, and therefore renders the Aircraft unreasonably dangerous to many people.

199. Any limitations or disclaimers of implied warranties are void given Textron Aviation's knowledge and concealment of the Defect, as well as the serious safety risks posed to Aircraft owners, passengers, and crew by the Defect.

200. As a direct and proximate result of Textron Aviation's breach of the implied warranty of merchantability, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs required to return their Aircraft to a safe condition, the costs of needed present and future repairs, an inability to use the Aircraft for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determined at trial.

201. Plaintiffs seek against Textron Aviation equitable relief, declaratory relief, actual damages, and attorneys' fees and expenses.

### COUNT III
### FRAUDULENT CONCEALMENT

202. Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

203. Plaintiffs bring this claim on behalf of themselves and the Class.

204. Textron Aviation is liable for both fraudulent concealment and omission. *See, e.g.*, Restatement (Second) of Torts §§ 550–51 (1977).

205. Textron Aviation intentionally concealed and suppressed material facts concerning the susceptibility of the Aircraft to serious, dangerous Corrosion of the window frames and body components, and the full cost of repairing the Corrosion Defect in order to return the Aircraft to a safe condition.

206. Textron Aviation has still not made full and adequate disclosure and continues to defraud Plaintiffs and the other Class Members and conceal material information regarding the

- 49 -

Corrosion Defect in the Aircraft. Textron Aviation has implied that the Service Bulletin Repair will fully and completely repair the Defect. However, the repairs specified under the Service Bulletin do not provide the structural reinforcement or replacement necessary to restore the structural stability lost through Corrosion damage to the Aircraft's body components and the subsequent loss of metal thickness caused by the removal of the Corrosion during the repair. Textron Aviation has never publicly acknowledged that Aircraft with the Corrosion Defect require the Full Corrosion Repair. Although Textron Aviation has released the Service Bulletin, it still refuses to acknowledge the full impact of the Corrosion Defect on the airworthiness of the Aircraft and the full extent of the repairs that would be required to remedy the Defect.

207.    Textron Aviation had a duty to disclose this information because:

a.    Textron Aviation had exclusive and superior knowledge of the Corrosion Defect and knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Corrosion Defect prior to purchasing or leasing the Aircraft, given its progressive and hidden nature;

b.    Textron Aviation made partial and incomplete disclosures about the safety, reliability, and durability of the Aircraft, the quality of its service centers and repair program, and the coverage provided by the Limited Warranty. When Textron Aviation did disclose the possibility of "moisture intrusion" in the Service Bulletin, it continued to conceal the full nature, severity, and danger of the Defect, as well as the full cost of repair; and

c.    The Corrosion Defect presents a serious, hidden safety defect that can impact the structural strength and stability of the Aircraft's airframe. Moreover, the Service Bulletin Repair offered by Textron Aviation to fix the Corrosion Defect has the potential to further weaken important structural components of the Aircraft. If the structural components of

the Aircraft are weakened, as happens as a result of the Corrosion Defect, the Aircraft becomes susceptible to catastrophic failure while in flight or upon take-off and landing. Such a profound safety risk should have been revealed to Plaintiffs and Class Members by Textron Aviation, but it was not.

208.    The existence of the Corrosion Defect was a material fact to Plaintiffs and Class Members: The Corrosion Defect directly impacts the safety, longevity, value, airworthiness, and usability of the Aircraft purchased by Plaintiffs and the other Class Members. No purchaser would knowingly invest in an Aircraft that would require them to pay several hundred thousand dollars or more out of pocket to remedy a serious safety defect that is the sole responsibility of the manufacturer.

209.    Plaintiffs and Class Members relied on Textron Aviation's omission of the material fact of the Corrosion Defect when choosing to purchase their Aircraft. Rather than revealing the true defective nature of the Aircraft, Textron Aviation instead made misleading statements in advertisements, promotional materials, and to Plaintiffs and Class Members directly about the safety, longevity, value, airworthiness, and usability of the Aircraft. Upon release of the Service Bulletin, Plaintiffs and Class Members continued to rely on Textron Aviation's representations that the Service Bulletin Repair provided a safe and effective repair that would not further impact the safety of the Aircraft. Had Plaintiffs and Class Members been aware of the concealed Corrosion Defect that existed in the Aircraft, and the cost and time required to truly remedy the Defect, Plaintiffs and Class Members would have paid less for their Aircraft or would not have purchased them at all.

210.    As a direct and proximate result of Textron Aviation's concealment and/or suppression of facts about the Corrosion Defect, Plaintiffs and Class Members have been

damaged in that they are now compelled to spend a minimum of several hundred thousand dollars to repair the Corrosion Defect pursuant to the Full Corrosion Repair, in addition to the cost of the Service Bulletin Repair. To have these repairs completed requires the Aircraft to be out of service for months. Moreover, some Class Members have experienced wait times of over a year for the Full Corrosion Repair. While these Class Members wait for the repair, they are left with Aircraft that are dangerously defective and potentially unsafe to fly. Therefore, Plaintiffs and the other Class Members received goods that are unreasonably dangerous and have substantially impaired value, and they have suffered incidental, consequential, and other damages, including unreimbursed out-of-pocket costs of upwards of several hundred thousand dollars, the costs of necessary present and future repairs, an inability to use the Aircraft for their ordinary and intended purpose, and overpayment at the point of sale, in an amount to be determined at trial.

211.    Textron Aviation's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class Members' rights and well-being to enrich Textron Aviation.

212.    Plaintiffs and the other Class Members seek an order enjoining Textron Aviation's unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to punitive damages, attorneys' fees, and costs of suit.

## COUNT IV
## UNJUST ENRICHMENT

213.    Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

214.    Plaintiffs bring this claim on behalf of themselves and the Class.

215.   Plaintiffs bring this claim in the alternative to their claim for Breach of Express Warranty.

216.   Textron Aviation has received an unjust profit from selling and leasing defective Aircraft that had artificially inflated prices due to Textron Aviation's concealment of the Corrosion Defect, and Plaintiffs and the other Class Members have overpaid for these aircraft.

217.   Plaintiffs and Class Members purchased Aircraft that they would otherwise not have purchased, or for which they would have paid less money, had they known of the Corrosion Defect and its safety risks, and that Textron Aviation's representations about the quality, longevity, durability, airworthiness, and safety of the Aircraft were false and/or misleading.

218.   Textron Aviation has received and retained unjust benefits from Plaintiffs and the other Class Members, and inequity has resulted.

219.   Specifically, Textron Aviation receives and appreciates a direct financial benefit from the sale of its products to end consumers. The sale of Cessna aircraft to end consumers results in revenues that are either paid directly to Textron Aviation or used by intermediaries to pay Textron Aviation for its products. With respect to its resale program specifically, Textron Aviation uses its marketing and assurances to convince secondary buyers to confer a benefit upon Textron Aviation—namely, purchase of a secondhand CJ4 aircraft that subsidizes the purchase of a new CJ4 aircraft from Textron Aviation by the previous owner. That is, Textron Aviation's success is directly associated with the volume of product sales to end consumers, such as Plaintiffs and Class Members. Textron Aviation also has and will receive payments from Class Members for repairs made to their Aircraft to address the Defect, as well as additional payments for warranties, service, and other ongoing costs associated with owning a new or used CJ4 aircraft.

220.    It is inequitable and unconscionable for Textron Aviation to retain these benefits.

221.    Because Textron Aviation concealed its fraud and deception, Plaintiffs and the other Class Members were not aware of the true facts concerning the Aircraft and did not benefit from Textron Aviation's misconduct.

222.    Textron Aviation knowingly accepted the unjust benefits of its misconduct.

223.    Plaintiffs and Class Members therefore seek both restitution of the monies they paid and overpaid and/or non-restitutionary disgorgement of Textron Aviation's profits in an amount to be determined at trial.

## COUNT V
## NEGLIGENT MISREPRESENTATION

224.    Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

225.    Plaintiffs bring this claim on behalf of themselves and the Class.

226.    Textron Aviation owed Plaintiffs and Class Members a duty to make accurate representations to Plaintiffs and Class Members regarding the quality, condition, and durability of the CJ4, including its representations that the CJ4 was free from defects in materials and workmanship, met applicable specifications, and was suitable for safe and reliable operation over its expected useful life.

227.    Plaintiffs and Class Members justifiably relied on Textron Aviation's representations in purchasing and continuing to own their CJ4s and would not have purchased them on the same terms, or at the same price, had they known the true facts.

228.    Plaintiffs' and Class Members' CJ4 purchases were business transactions conducted in the course of Textron Aviation's business.

229.    Textron Aviation breached its duty by making representations that the CJ4 was free from defects in materials and workmanship, met applicable specifications, and was suitable

- 54 -

for safe and reliable operation over its expected useful life to Plaintiffs and Class Members without exercising reasonable care or competence in obtaining or communicating the information, despite having access to engineering data, service records, and other information revealing the existence and nature of the Defect.

230.    These misrepresentations were made by Textron Aviation for the benefit of Plaintiffs and Class Members as purchasers of CJ4s. To the extent that Textron Aviation's misrepresentations were conveyed to Plaintiffs and Class Members by third parties, including commercial brokers, Textron Aviation knew these misrepresentations would be conveyed to Plaintiffs and Class Members by those third parties.

231.    As a direct and proximate result of Textron Aviation's breaches, Plaintiffs and Class Members have suffered damages including diminution in value, loss of use, substantial repair costs, physical damage to the CJ4, and loss of the benefit of their bargains.

232.    Plaintiffs and the other Class Members seek an order enjoining Textron Aviation's unfair, unlawful, and/or deceptive practices, as well as declaratory relief. In addition, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to punitive damages, attorneys' fees, and costs of suit.

**COUNT VI**
**STRICT LIABILITY - FAILURE TO WARN**
**(Kan. Stat. Ann. § 60-3301 *et seq*.)**

233.    Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

234.    Plaintiffs bring this claim on behalf of themselves and the Class.

235.    Textron Aviation is in the business of designing, manufacturing, marketing, and selling general aviation aircraft and holds the Type Certificate for the CJ4. As such, Textron Aviation bears ongoing, non-delegable duties, arising by operation of law and not by contract, to

ensure the CJ4's airworthiness and to warn owners, operators, and maintenance personnel of known or reasonably knowable hazards.

236.   The CJ4 was placed into the stream of commerce in a defective and unreasonably dangerous condition because it was accompanied by inadequate warnings and instructions concerning the existence, nature, progression, and safety risks of the Defect, and the true scope and cost of necessary repairs. Moreover, Defect is hidden from owners, can only be discovered upon inspection of the Aircraft by Textron Aviation-certified service centers, and impacts the airworthiness and safety of the Aircraft. Given the hidden nature of the Defect, there are no actions Plaintiffs and Class Members could have taken to mitigate the risks or impacts of the Defect.

237.   Textron Aviation knew or, in the exercise of reasonable care, should have known that the absence of adequate warnings created foreseeable risks of serious harm to Aircraft owners, operators, passengers, and the public from untreated corrosion due to the Defect.

238.   Textron Aviation failed to provide adequate warnings in its manuals, maintenance guidance, service materials, and communications to owners, including by issuing the Service Bulletin that understated the condition, omitted its safety implications, and failed to mandate timely inspection and repair.

239.   As a direct and proximate result of Textron Aviation's breaches, Plaintiffs and Class Members have suffered damages in the form of substantial repair costs and physical damage to the CJ4.

240.   Plaintiffs and the other Class Members seek an order enjoining Textron Aviation's unfair, unlawful, and/or deceptive practices, as well as declaratory relief. Plaintiffs

and the other Class Members are entitled to recover actual damages, together with appropriate

penalties, including but not limited to punitive damages, attorneys' fees, and costs of suit.

**COUNT VII**
**NEGLIGENCE - DESIGN DEFECT**
**(Kan. Stat. Ann. § 60-3301 *et seq*.)**

241.   Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

242.   Plaintiffs bring this claim on behalf of themselves and the Class.

243.   Textron Aviation owed Plaintiffs and Class Members duties, independent of any

contractual obligations, to design the CJ4 in a reasonably prudent manner, free from defects, and

in compliance with including but not limited to applicable FAA Regulations, including non-

delegable duties imposed by law under 14 C.F.R. § 23, and 14 C.F.R. § 21 to design and

manufacture airworthy aircraft. Textron Aviation breached these duties by designing and

manufacturing the CJ4 in a manner that permitted the Defect to exist and persist, thereby

allowing progressive Corrosion to develop in primary structure, and by failing to incorporate

materials, configurations, or protective measures that would have prevented such Corrosion

during the CJ4's expected useful life, in violation of federal regulations. In particular, the

violation of Textron Aviation's duties under application regulations include, but are not limited

to, its duties to:

a.   "[D]esign each part, article, and assembly for the expected operating

conditions of the airplane." 14 C.F.R. § 23.2250(a).

b.   "[P]rotect each part of the airplane, including small parts such as fasteners,

against deterioration or loss of strength due to any cause likely to occur in the expected

operational environment." 14 C.F.R. § 23.2255(a).

c.   Design "[e]ach part of the airplane" to have "adequate provisions for

ventilation and drainage." 14 C.F.R. § 23.2255(b).

- 57 -

d.  "[D]etermine the suitability and durability of materials used for parts, articles, and assemblies, accounting for the effects of likely environmental conditions expected in service, the failure of which could prevent continued safe flight and landing." 14 C.F.R. § 23.2260(a).

e.  "[D]evelop and implement inspections or other procedures to prevent structural failures due to foreseeable causes of strength degradation, which could result in serious or fatal injuries, or extended periods of operation with reduced safety margins." 14 C.F.R. § 23.2240(a).

244.  As a direct and proximate result of Textron Aviation's breaches, Plaintiffs and Class Members have suffered damages in the form of substantial repair costs and physical damage to the CJ4. As such, Plaintiffs and the other Class Members are entitled to recover actual damages, together with appropriate penalties, including but not limited to punitive damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members also seek an order enjoining Textron Aviation's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.

**COUNT VIII**
**STRICT LIABILITY DESIGN DEFECT**
**(Kan. Stat. Ann. § 60-3301 *et seq*.)**

245.  Plaintiffs repeat and reallege paragraphs 1-168 as if fully set forth herein.

246.  Plaintiffs bring this claim on behalf of themselves and the Class.

247.  Textron Aviation failed to design the CJ4 in a reasonably prudent manner, free from defects, and in compliance with including but not limited to applicable FAA Regulations, including non-delegable duties imposed by law under, 14 C.F.R. § 23, and 14 C.F.R. § 21 to design and manufacture airworthy aircraft. In particular, the violation of Textron Aviation's duties under application regulations include, but are not limited to, its duties to:

- 58 -

a.     "[D]esign each part, article, and assembly for the expected operating conditions of the airplane." 14 C.F.R. § 23.2250(a).

b.     "[P]rotect each part of the airplane, including small parts such as fasteners, against deterioration or loss of strength due to any cause likely to occur in the expected operational environment." 14 C.F.R. § 23.2255(a).

c.     Design "[e]ach part of the airplane" to have "adequate provisions for ventilation and drainage." 14 C.F.R. § 23.2255(b).

d.     "[D]etermine the suitability and durability of materials used for parts, articles, and assemblies, accounting for the effects of likely environmental conditions expected in service, the failure of which could prevent continued safe flight and landing." 14 C.F.R. § 23.2260(a).

248.    The Defect existed in all CJ4s when they left Textron Aviation's control, reached Plaintiffs and Class Members without substantial change, and renders all CJ4s unreasonably dangerous because the Defect is hidden from owners, can only be discovered upon inspection of the Aircraft by Textron Aviation-certified service centers, and impacts the airworthiness and safety of the Aircraft.

249.    Textron Aviation employed design choices, materials, and manufacturing techniques that were inadequate to prevent the Corrosion condition described in the preceding paragraphs, and continued to use or approve processes that allowed the Defect to develop and persist.

250.    As a direct and proximate result of Textron Aviation's breaches, Plaintiffs and Class Members have suffered damages in the form of substantial repair costs and physical damage to the CJ4. As such, Plaintiffs and the other Class Members are entitled to recover actual

- 59 -

damages, together with appropriate penalties, including but not limited to punitive damages, attorneys' fees, and costs of suit. Plaintiffs and the other Class Members also seek an order enjoining Textron Aviation's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.

## VIII.   PRAYER FOR RELIEF

251.    Plaintiffs, on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Textron Aviation, as follows:

a.    an award to Plaintiffs and the other Class Members of compensatory, exemplary, punitive, and statutory damages, including interest, in an amount to be proven at trial against Textron Aviation, encompassing benefit-of-the-bargain damages, reimbursement for funds paid to repair and/or remediate the Corrosion Defect, and incidental damages, as well as any other appropriate declaratory or injunctive relief;

b.    an order requiring Textron Aviation to disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten revenue it received from the sale of the Aircraft, or make full restitution thereof to Plaintiffs and the other Class Members;

c.    an order declaring any releases signed by Plaintiffs and Class Members as a condition of repairing the Corrosion Defect null and void as a matter of public policy because they were obtained by fraudulent inducement and/or signed under extreme economic and practical duress;

d.    an injunction ordering Textron Aviation to immediately notify all owners of the Corrosion Defect and the fact that it involves a safety risk, and provide inspections and all necessary repairs free of charge and in a timely manner;

e.  an order certifying the proposed Class and any subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

f.  leave to amend this Complaint to conform to the evidence obtained in discovery or produced at trial;

g.  an award of attorneys' fees and costs, as allowed by law; and

h.  such other relief as may be appropriate under the circumstances.

## IX.  **DEMAND FOR A JURY TRIAL**

252.  Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial for all claims so triable.

## X.  **DESIGNATION OF PLACE OF TRIAL**

253.  Plaintiffs, by and through counsel, designate Kansas City, Kansas as the place for trial herein.

Dated: December 8, 2025

By:    */s/ Diane K. Watkins*
Thomas P. Cartmell (KS Bar No. 17020)
Diane Watkins (KS Bar No. 20991)
**WAGSTAFF & CARTMELL, LLP**
4740 Grand Ave #300
Kansas City, MO 64112
Telephone: (816) 701-1100
tcartmell@wcllp.com
dwatkins@wcllp.com

Kevin E. Epps (pro hac vice)
Tyler M. Gaines (pro hac vice)
**EPPS, HOLLOWAY, DELOACH
& HOIPKEMIER, LLC**
1220 Langford Drive,
Bldg. 200, Ste 101
Watkinsville, GA 30677
Telephone: (706) 508-4000
kevin@ehdhlaw.com
tyler@ehdhlaw.com

Jonathan D. Selbin (pro hac vice)
Jason L. Lichtman (pro hac vice)
Muriel J. Kenfield-Kelleher (pro hac vice)
Lucas Issacharoff (pro hac vice)
**LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP**
250 Hudson St., 8th Fl
New York, New York 10013
Telephone:  (415) 956-1000
jselbin@lchb.com
jlichtman@lchb.com
mkenfieldkelleher@lchb.com
lissacharoff@lchb.com

Irwin B. Levin*
Jonathan Knoll*
**COHENMALAD LLP**
One Indiana Sq #1400
Indianapolis, IN 46204
Telephone:  (463) 282-6287
ilevin@cohenmalad.com
jknoll@cohenmalad.com

Michael F. Ram (pro hac vice)
**MORGAN & MORGAN, P.A.**

- 62 -

- 63 -

711 Van Ness Ave, Suite 500
San Francisco, CA 94102
Telephone: (415) 846-3862
MRam@forthepeople.com

*Attorneys for Plaintiffs*
**pro hac vice* forthcoming

- 64 -

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

By:      */s/ Diane K. Watkins*
Thomas P. Cartmell (KS Bar No. 17020)
Diane K. Watkins (KS Bar No. 20991)
**WAGSTAFF & CARTMELL**
4740 Grand Ave #300
Kansas City, MO 64112
Telephone: (816) 701-1100
tcartmell@wcllp.com
dwatkins@wcllp.com